Alex R. Straus (SBN: 321366)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN**
280 Beverly Hills Drive, Penthouse.
Beverly Hills, CA 90212
Telephone:   310-450-9689
Facsimile:   310-496-3176
astraus@milberg.com

[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARK BRIGGS, on behalf of himself and all others similarly situated, | **Case No.: 3:21-cv-6645** |
| Plaintiff, | **CLASS ACTION COMPLAINT** **Jury Trial Demanded** |
| v. | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | |
| Defendant. | |

Plaintiff Mark Briggs, individually, and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant International Business Machines Corporation ("IBM") and alleges the following:

## INTRODUCTION

1.     California Labor Code Section 2751 requires that an employer provide sales representatives who earn commissions with an enforceable written contract setting forth the method by which commissions shall be computed and paid that is signed by the employer.

1

2.    IBM employs hundreds, if not thousands, of sales representatives and managers throughout California who earn sales commissions. However, IBM does not provide those employees with a written, signed, enforceable contract regarding their commissions.

3.    Instead, IBM provides its sales representatives with a letter that is not a contract and that IBM has argued (successfully) in court provides no contractual obligation to pay commissions at all.  IBM's policy is that commissions are uncapped. IBM explains its commissions plans with PowerPoint type presentations that promise uncapped sales commissions and encourage sales representatives to exceed their quotas each sales period.

4.    However, IBM often caps sales commissions or otherwise does not pay the full commissions that are due to sales representatives. As a result, it has been sued over two dozen times around the country (including at least eight times in California) for failing to pay sales representatives and managers the commissions they were due. Each time, IBM has taken the position in court that it was not obligated to pay any commissions to these employees because it did not have a contract that required payment of the commissions.

5.    IBM's sales representatives and even managers are often surprised to learn that IBM does not have a binding contract to pay them sales commissions.

6.    IBM's bait-and-switch – where it makes sales representatives believe that they will be paid uncapped sales commissions in accordance with their commissions formula, and then often does not pay as such – is precisely the type of conduct that the California Labor Code seeks to deter through its requirement that employers provide written contracts that set forth the method by which commissions will be computed and paid to their sales representatives.

7.    Plaintiff Mark Briggs is another victim of IBM's blatant disregard for California's Labor Code. As a manager, his story stems from IBM's capping of sales

CLASS ACTION COMPLAINT
Jury Trial Demanded

representative David Swafford's commissions when Mr. Swafford reported to Mr. Briggs.

8.      Plaintiff filed this action to recover the damages that he has, and hundreds of other sales employees in California have, incurred from IBM's wrongful withholding of sales commissions and to stop IBM's deceptive and unlawful practices in how they structure and administer commissions for all IBM employees in the State of California who are on commission incentive plans.

## PARTIES

9.      Mr. Briggs is a citizen of San Clemente, California, in Orange County.

10.     Mr. Briggs worked for IBM for over 26 years, from approximately January 1995 through present.

11.     IBM was incorporated, and is existing, under the laws of the State of New York.

12.     IBM's principal place of business is in the State of New York.

13.     IBM was and is an employer under the California Labor Code and common law.

14.     IBM employed Plaintiff and other employees performing sales work for IBM in California.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act. The amount in controversy exceeds $5,000,000 and there are members of the proposed Class who are citizens of a State different from the State of Citizenship of IBM.

16.     This Court may exercise personal jurisdiction over IBM because IBM conducts substantial business in this State and within the Central District of California, receives substantial compensation and profits from the marketing,

CLASS ACTION COMPLAINT
Jury Trial Demanded

distribution, and sales of products and services in this District, and has engaged in the unlawful practices described in this Complaint in this District.

17.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because: (1) IBM resides and is subject to the Court's personal jurisdiction in this judicial district; and (2) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

18.     IBM is a global technology company that provides hardware, software, cloud-based services, and cognitive computing.

19.     IBM employs sales representatives and managers throughout the United States that it tasks with selling its products and services.

20.     During all relevant times, IBM's employees that earn sales commissions have typically been on one of seven types of commissions plans.

21.     Typically, under these plans the employees are provided with an annual compensation number called "on-target earnings" ("OTE") which is what the individual's total compensation will be if the individual achieves 100% of his/her quota for the year. The OTE is split between a base salary and commissions. The two most common splits are 55/45 (where 55% of the compensation comes from the base salary, and 45% comes from sales commissions) and 70/30 (where 70% of the compensation comes from a base salary, and 30% comes from sales commissions).

22.     Three of those commissions plans are categorized as Individual Plans, three are Pool Plans, and one is categorized as a Services Plan.

23.     The three Individual Plans are: (1) Individual Quota Plan (IQP), (2) Absolute Sales Plan – Straight Rate, and (3) Absolute Sales Plan – Opportunity Based.

24.     Commissions under these plans are uncapped and paid based on achievement results (i.e., the amount of products and services sold) rather than on an assessment of employee contribution.

4

CLASS ACTION COMPLAINT
Jury Trial Demanded

25. The three Pool Plans are: (1) Team Quota Plan, (2) Solutions for Growth Plan, and (3) Performance Pool Plan.

26. Under the pool plans, a set amount of commissions is divided among groups of employees based on achievement by the group as a whole.

27. The Services Plan is a commissions plan that is available to executives and other roles that are focused on large contract delivery, customer satisfaction, and base growth.

28. IBM splits each calendar year into two sales periods and typically refers to those as the 1H (first half) and 2H (second half).

29. At the beginning of each sales period, IBM provides each sales representative with a substantially similar, standardized document called an Incentive Plan Letter ("IPL").

30. The IPLs are typically about five pages long and contain some limited information that is specific to each individual sales representative, such as the representative's quota for that period, the territory the sales representative is responsible for, and the rate at which the sales representative will earn commissions for that period.

31. The majority of the five pages of each IPL is devoted to uniform disclaimers. These disclaimers are the same in each sales representative's IPL for each sales period.

32. Among other things, the disclaimers prior to 1H 2018 state that the IPL "is not an express or implied contract or a promise by IBM" to pay commissions to that employee.

33. Since 1H 2018, IBM has continued to argue in court (successfully) that the IPL, including post-2018 versions of the IPL, is not a contract and that IBM does not otherwise have a contractual obligation to pay commissions, which is the whole point of a commissions contract.

CLASS ACTION COMPLAINT
Jury Trial Demanded

34.     IBM does not have any other contract with its California based sales employees who earn commissions regarding the calculation and payment of those commissions.

35.     In the past several years, IBM has routinely failed to pay employees the commissions reflected by the quotas contained in IPLs and other inputs shown on IBM's online commissions workplace.

36.     As a result, several sales representatives and managers have sued IBM for not paying them commissions that they were owed.

37.     Each time, IBM's defense has been the same: IBM owes nothing because the employees do not have an enforceable contract for the payment of commissions. IBM claims that the IPL is not an enforceable contract, nor is there any other enforceable contract.

38.     Indeed, IBM has argued that the IPL is not an enforceable contract, nor is there any other enforceable contract in each of the following cases:

        a.  *Gilmour v IBM*, Case No. CV 09-04155 SJO (C.D. Cal.);

        b.  *Schwarzkopf v. IBM*, Case No. CV 08-2715 JF (N.D. Cal.);

        c.  *Kemp v. IBM*, Case No. 3:09-cv-03683 (N.D. Cal);

        d.  *Pfeister v. IBM*, Case No. 17-cv-03573 (N.D. Cal.);

        e.  *Swafford v. IBM*, Case No. 5:18-CV-04916 (N.D. Cal.);

        f.  *Beard v. IBM*, Case No. 3:18-CV-06783 (N.D. Cal.);

        g.  *Geras v. IBM*, Case No. 10cv-00001-WDM-CBS (D. Colo.);

        h.  *Bereuter v. IBM*, Case No. 8:10-cv-327 (D. Neb.);

        i.  *Kavitz v IBM*, Case No. 4:08-cv-5591 (S.D.N.Y.);

        j.  *Chiaffitelli v. IBM*, Case No. 003150/11 (Sup. Ct. NY, Nassau County);

        k.  *Pero v. IBM*, Case No. 12-cv-07484 (D.N.J.);

        l.  *Wilson v. IBM*, Case No. 1:12-cv-1406 (N.D. Ga.);

CLASS ACTION COMPLAINT
Jury Trial Demanded

m.  *Tang v. IBM*, Case No. 2014-11444 (Cir. Ct. Fairfax Cty., Va.);

n.  *IBM v. Khoury*, Case No. 2016-0258 (Sup. Ct. N.H.);

o.  *Rapier v. IBM*, Case No. 1:17-CV-4740 (N.D. Ga.);

p.  *Snyder v. IBM*, Case No. 1:16-CV-03596 (N.D. Ga.);

q.  *Morris v. IBM*, Case No. 18-CV-0042 (W.D. Tex.);

r.  *Choplin v. IBM*, Case No. 1:16-CV-1412 (M.D.N.C.);

s.  *Stephenson v. IBM*, Case No. 1:17-CV-1141 (M.D.N.C.);

t.  *Vinson v. IBM*, Case No. 1:17-CV-00798 (M.D.N.C.);

u.  *Middleton v. IBM*, Case No. 1:18-CV-03724 (N.D. Ga.);

v.  *Fessler v. IBM*, Case No. 1:18-CV-00798 (E.D.Va.);

w.  *Kingston, Temidis, & Lee v. IBM*, Case No. 156289/2018 (Sup. Ct. N.Y.);

x.  *Lamping v IBM*, 2005 WL 4693547 (W.D. Pa.);

y.  *Cashman v IBM*, Case No. 05-10306-RWZ (D. Mass.);

z.  *Jensen v IBM*, Case No. 04-CA-1316 (E.D. Va.);

aa. *Rudolph v IBM*, Case No. 09-C-428 (N.D. Ill.);

bb. *Camobreco v. IBM*, Case No. 1:19-CV-10242 (D. Mass.); and

cc. *Martignetti v. IBM*, Case No. 1:18-CV-02431 (D. Md.).

39.   Several of these cases, including at least *Swafford* and *Beard*, involved incentive plans for California residents from the last four years.

40.   Despite both *Swafford* and *Beard* involving claims for unpaid commissions by sales representatives on 55/45 pay mixes (meaning that 45% of the pay was expected to come from commissions and not salary), IBM's litigation position in those cases was that the IPLs at issue "did not create a contractual obligation that required IBM to pay Plaintiff additional commissions."

41.   Moreover, IBM argued on appeal in *Middleton* that "Middleton's IPL, while failing to create any contractual obligations requiring IBM to pay him

7

CLASS ACTION COMPLAINT
Jury Trial Demanded

commissions, was a document that spelled out the parties' respective rights and responsibilities regarding the payment of commissions."

42.     California Labor Code Section 2751 dictates that "[w]henever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and shall set forth the method by which the commissions shall be computed and paid." Cal. Lab. Code § 2751.

43.     This provision clearly requires that an employer provide a sales representative whose pay includes sales commissions with an enforceable contract for the payment of the commissions.

44.     The California requirement that all employers provide employees earning commissions with a written commission contract became effective January 1, 2013.

45.     An enforceable contract protects commissioned sales employees from exactly the type of bait-and-switch behavior IBM is engaging in, where it promises compensation to sales representatives and managers of a base salary plus uncapped sales commissions, but then unilaterally decides not to pay the commissions on certain occasions.

46.     The situation where an employer "holds all of the cards" with respect to how much to pay in sales commissions is precisely what this statute is designed to protect employees from.

47.     Without an enforceable contract the commissions would simply be discretionary bonuses, which IBM's sales commissions undisputedly are not.

48.     Because IBM has openly admitted that it does not have an enforceable contract for the payment of commissions to its employees, IBM's commissions program cannot satisfy the requirements of California Labor Code Section 2751.

49.     Indeed, in *Swafford*, in her Order Granting in Part, Denying in Part, IBM's Motion for Summary Judgment, the Honorable Lucy H. Koh stated that "the

CLASS ACTION COMPLAINT
Jury Trial Demanded

Court agrees with Swafford that the IPL is not a contract and that the IPL therefore cannot satisfy the requirements of California Labor Code Section 2751." When IBM capped Mr. Swafford commissions, it also capped Mr. Briggs's commissions because Mr. Briggs was Mr. Swafford's manager.

50.     After Judge Koh's ruling in *Swafford*, the plaintiff in *Beard* moved for judgment on the pleadings regarding his claim for violation of California Labor Code Section 2751.  IBM claimed in response that the IPL was a document that satisfied the statute, although it never admitted that the IPL was an "enforceable contract" and it never specified the alleged "obligations" that the IPL imposed on IBM.

51.     Plaintiff and the Classes have suffered an injury in fact, including lost money, as a result of IBM's failure to have enforceable written contracts—which presumably IBM would have complied with, but which could be the basis for an easy breach of contract claim if it did not.  Put another way, the obvious purpose of California Labor Code Section 2751's requirement of a written contract is to legally obligate employers to specify how commissions will be paid and pay them.  If an employer violates California Labor Code Section 2751 by not having such a contract, then its employees are harmed because the employer is not obligated to specify and pay commissions under such a contract.  Here, if IBM had complied with California Labor Code Section 2751, it would have had enforceable contracts with Plaintiff and the members of the Classes; IBM would have complied with those contracts, or its employees could easily sue if IBM did not, and either way the employees would be in a better situation than they are now.

52.     Indeed, any other interpretation would render California Labor Code Section 2751 a nullity.  It would make no difference to employees whether or not their employer complies with California Labor Code Section 2751: the employer can comply with that statute, or it can blatantly violate the statute, but neither choice would have any effect on the employees.  Quite obviously that is contrary to the text and purpose

9

CLASS ACTION COMPLAINT
Jury Trial Demanded

of California Labor Code Section 2751, which was designed to and by its plain text does give employees something: an enforceable obligation from their employer.   If their employer does not give them that enforceable obligation, then they are harmed. California Labor Code Section 2751 is a mandate, not some gentle suggestion to employers that causes no harm when it is ignored.

## PLAINTIFF'S FACTS

53.     Mr. Briggs began his employment as an IBM sales representative in approximately January 1995.

54.     He became an IBM manager in 1998 and proceeded to hold various roles at the managerial level from 1998 to present.

55.     He has been an individual contributor and manager for OEM Embedded SW Sales since around April 2013.

### IBM Promised Mr. Briggs That His Commissions Were Uncapped

56.     IBM managers' compensation consists of a base salary paired with uncapped commissions based on the achievement of their sales representatives.

57.     Said another way, everything that a seller sells rolls up to the manager's achievement.

58.     At all relevant times, Mr. Briggs's compensation consisted of a base salary paired with uncapped commissions, and the incentive plan he was on was the Individual Quota Plan.

59.     During his time at IBM, Mr. Briggs and other sales employees regularly received PowerPoint presentations describing the terms of the commission plans being offered to them. These PowerPoints consisted of over 200 pages worth of slides, and are collectively referred to as the "Educational Materials." Each year, the Educational Materials explained that sales commissions were uncapped. Nowhere in the Educational Materials is there anything stating or even suggesting that sales commissions may be capped in some instances or that IBM reserves the right to cancel

10

CLASS ACTION COMPLAINT
Jury Trial Demanded

or modify whether and to what extent commissions may be capped. The Educational Materials are unequivocal and state repeatedly that commissions are uncapped. These Educational materials were also available for Mr. Briggs, and other sales employees, to download during the entirety of the sales period (July-December of 2016) and afterwards.

60.    IBM made a substantially similar version of this PowerPoint available to Mr. Briggs each year for the purpose of highlighting and explaining the important terms of his compensation.

61.    The PowerPoint was titled "Our Purpose, Values & Practices" relating to "Your 2016 Incentive Plan," and it stated that the goal of the incentive plan is "to design and deliver sales incentives that motivate your performance and are strategically aligned with IBM's strategy and transformation." Page 13 of the PowerPoint specifically stated that "[e]arnings opportunity remains uncapped."  In fact, the presentation mentions no less than six times in its 18 pages that "payments" and/or "earnings opportunit[ies]" are "uncapped."

62.    These representations were repeated in sales meetings.

63.    In fact, IBM instructs its managers to tell sales employees during the sales kickoff calls at the beginning of each sales period, and the managers actually do tell them, that commissions are uncapped. These representations are also in line with IBM's written guidance to its managers, like Mr. Briggs, which provides:

> Conditions that may lead to an adjustment include the need to correct errors or the need to balance with employee's contribution to the success of a large sales transaction (which criteria must be clearly provided to Commissions team).

CLASS ACTION COMPLAINT
Jury Trial Demanded

1

**Adjustments must not be done only as a ceiling or cap**

2

**on the total earnings allowable to employees.**

3

(Emphasis added).

4

64.     Each sales period, Mr. Briggs was provided with a document titled an

5

IPL, which described some of the terms of his commissions plan, as alleged above.

6

65.     In each sales period before 1H 2018, the IPL expressly stated that it was

7

not an express or implied contract for the payment of commissions, as alleged above.

8

In sales periods after 1H 2018, the IPL did not include that provision, but IBM has

9

still claimed and argued (successfully) that those IPLs are not contracts.

10

66.     At no time during his employment by IBM was Mr. Briggs provided any

11

other contract for the payment of his commissions.

12

67.     As an IBM manager, Mr. Briggs's commissions were based on the

13

achievement and commissions of the sales representatives that reported to him,

14

including Mr. Swafford.

15

**Mr. Briggs's Commissions Were Capped**

16

68.     In 2016, Mr. Swafford worked on behalf of IBM to close two large deals of

17

IBM products and services with Oracle ("Oracle Deal") and Sabre, Inc. ("Sabre Deal").

18

Mr. Swafford was the sole sales representative responsible for the Oracle Deal and was

19

one of only two sales representatives responsible for the Sabre Deal.

20

69.     Mr. Swafford's effort in closing the Oracle and Sabre Deals resulted in

21

total sales of approximately $3,000,000 of IBM products and services. Mr. Swafford's

22

achieve detail report (IBM's internal record that reflects the revenue credit

23

attributable to Mr. Swafford) indicated that the total sales revenue attributable to him

24

for the second half of 2016 (for all deals he closed, including the Oracle and Sabre

25

Deals) was approximately $4,983,275. His quota at the time was $512,600.

26

70.     On the recognized revenue credit of $4,983,275, Mr. Swafford earned a

27

commission of $966,316 which should have been paid to him in January 2017 after the

28

CLASS ACTION COMPLAINT
Jury Trial Demanded

deals were closed at the end of December 2016. He was not paid any of this commission in January 2017.[1]

71.     Mr. Swafford was then initially told that he would be paid in full, as both his first line manager (Mr. Briggs), and second line manager (Richard Wirtenson) signed off on the commissions amount of $966,316 due to Mr. Swafford. Inexplicably, however, Mr. Swafford's third line manager, Don Leeke, did not approve the commissions payment.

72.     Mr. Swafford was then emailed by Mr. Briggs on February 23, 2017, who told Mr. Swafford that he had just been "informed by IBM that [Mr. Swafford's] attainment has been **capped** at 250% of plan." (emphasis added). The reason why? Mr. Briggs told Mr. Swafford in a phone call after that email that IBM decided it was simply too much money to pay Mr. Swafford the full commissions he had earned, and thus, IBM would be paying him only a portion of those commissions. In other words, IBM was capping Mr. Swafford's commissions to limit his earnings.

73.     Shortly after this, the internal IBM system indicated that Mr. Swafford would in fact be paid in full the commissions he had earned, including those on the Oracle and Sabre Deals and that he would receive his payment via direct deposit in March 2017.

74.     However, before the payment was to be deposited, Mr. Swafford received a call from an IBM employee informing him that he would be receiving a paper check, rather than direct deposit for these commissions.

75.     The commissions check he then received was in the amount of $153,384. When Mr. Swafford inquired about this discrepancy with Mr. Briggs, he was told that the commissions payments were still being reviewed by IBM.

---

[1] Mr. Swafford noted that he was overpaid by $19,375 in the first half of 2016 due to an error by IBM. This overpayment was to be deducted from the commissions Mr. Swafford earned in the second half of 2016. Any discussions herein of the commissions due and paid/unpaid to Mr. Swafford disregard this $19,375.

13

CLASS ACTION COMPLAINT
Jury Trial Demanded

76.     Mr. Swafford was then paid another $563,167 of the commissions from his sales in the second half of 2016, including the Oracle and Sabre Deals and was told that would be all that he would be paid for his work closing these two Deals. This left Mr. Swafford still owed approximately $249,765 in commissions he had earned that were arbitrarily capped by IBM.

77.     The only reason Mr. Swafford was ever provided by IBM for why he was not paid all of the commissions he had earned, was that IBM thought it was simply too much money to pay Mr. Swafford, and thus, it was unwilling to pay him in full.

78.     Indeed, after further attempts to learn why he had not been paid in full, Mr. Wirtenson, his second line manager emailed him on May 1, 2017, and said: "I made the recommendation to Don that we pay on all other deals 100% but CAP the Oracle and Sabre transactions at 150% of your quota on each."

79.     This reasoning did not make any sense to Mr. Swafford as he had clearly been promised uncapped commissions, and in fact, Mr. Swafford had earned nearly a million dollars worth of uncapped commissions the previous year and been paid every dime of them.

80.     IBM did not pay any other sales representatives the $249,765, or any part of that, that it owed to and withheld from Mr. Swafford, instead keeping the money for itself.

81.     IBM's decision to cap Mr. Swafford's commissions by limiting his attainment led to Mr. Briggs's commissions being capped as well because his attainment was similarly limited.

82.     Mr. Swafford filed suit to recover his commissions, in the Northern District of California. *See Swafford v. IBM*, Case No. 5:18-CV-04916 (N.D. Cal.) (the "*Swafford* Action". IBM's motions to dismiss and for summary judgment were largely denied by the Honorable Judge Lucy Koh. Indeed, and of particular relevance here, in her Order Granting in Part, Denying in Part, IBM's Motion for Summary Judgment,

CLASS ACTION COMPLAINT
Jury Trial Demanded

the Honorable Lucy H. Koh stated that "the Court agrees with Swafford that the IPL is not a contract and that the IPL therefore cannot satisfy the requirements of California Labor Code Section 2751."

83.   Mr. Swafford ultimately resolved his claims to the mutual satisfaction of the parties prior to trial.

84.   Even so, IBM still has not paid Mr. Briggs the full commissions he is owed for the same deals.

### Mr. Briggs Has Recently Learned That IBM Routinely Misrepresents That It Does Not Cap Commissions

85.   Recently, aside from the information gained in Mr. Swafford's case, Mr. Briggs has learned that IBM has a history of capping commissions.

86.   The sales field in which Mr. Briggs worked for IBM is highly competitive, and most employers do not cap commissions. Were IBM to actually tell its sales representatives and managers that their commissions could be capped, it would be severely hampered in its efforts to recruit good sales representatives and motivate them to maximize their efforts to increase their sales.  As a result, IBM engages in a practice whereby it tells its salespeople that their commissions will not be capped, both verbally and in written documents like the PowerPoint presentation, and then it caps certain high achievers after the fact.

87.   There are other cases that have been filed around the country, including in the Middle District of North Carolina, and the Northern District of California that are very similar to this one and that have yielded significant discovery. One of those cases is *Bobby Choplin v. International Business Machines Corporation*, No. 16-cv-1412-TDS-JEP ("the *Choplin* Action"), which was recently resolved. The plaintiff in the *Choplin* Action had an IPL that was in relevant part identical or substantially similar to Mr. Briggs's IPL, and the plaintiff was shown a PowerPoint presentation that was in relevant part identical or substantially similar to the PowerPoint presentation

15

CLASS ACTION COMPLAINT
Jury Trial Demanded

shown to them. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. *Choplin*, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Briggs, and what IBM actually paid him and why.

88.    In the *Choplin* Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit A**); (2) a deposition of Mr. Choplin's first-line (i.e., immediate) manager, Thomas Batthany (**Exhibit B**); (3) a deposition of Mr. Choplin's second-line (i.e., two levels up) manager, Haleh Maleki (**Exhibit C**); and (4) a deposition of Mark Dorsey, a former IBM Vice President of Software Sales (i.e., one of the highest-level sales managers in the corporation) (**Exhibit D**).  Together, Exhibits A, B, C, and D are referred to as the "Choplin Depositions." All of this testimony taken under oath in the Choplin case, including the testimony quoted below, applies equally and fully to Mr. Briggs here.

89.    The testimony in the Choplin Depositions make clear the following, among other things: (1) because of the statements in the PowerPoints, and in light of the IPLs, IBM had an "obligation" not to "cap" the commission for sales employees like Mr. Choplin and Mr. Briggs; (2) sales employees like Mr. Briggs were entitled to rely on the statements in the PowerPoints that their commissions would be not be "capped," and that reliance was understood by IBM and was reasonable; and (3) what IBM in fact did, when it reduced the commissions in the way that it did for Mr. Choplin and Mr. Briggs, was "capping."  For example:

a.  IBM testified as follows:

Q.  The fourth bullet point, you could read that, please.

A.  "Earnings opportunity remains uncapped."

Q.  Okay.  So you would agree that IBM when explaining his compensation plan for the first half of 2015 represented to Bobby

CLASS ACTION COMPLAINT
Jury Trial Demanded

1      Choplin that his earnings opportunity remains uncapped, wouldn't

2      you?

3      A. Correct.

4      Q. Would you also agree that IBM represented to Bobby Choplin

5          regarding his first half of 2015 compensation plan that payments

6          were uncapped?

7      A. Correct.

8      Q. So would you agree that IBM had an obligation not to cap Bobby

9          Choplin's earnings opportunity?

10     A. Yes.

11     Q. Would you agree that IBM had an obligation not to cap Bobby

12         Choplin's payments?

13     A. Correct.

14  (Exhibit A, pp. 18-19.)   When asked specifically about whether a salesperson could

15  reasonably rely on the statements in the PowerPoints, IBM testified:

16     Q. And it would be reasonable for a salesperson like Bobby Choplin to

17         rely on the information in Exhibit 65, 66 and 67 [PowerPoints]

18         regarding their compensation plan?

19     A. Yes.

20  (Exhibit A, pp. 67-68.)

21     b. Mr. Batthany testified as follows about the statements in the

22         PowerPoint that commission would be not be capped:

23     Q. Okay. It would be reasonable for someone to understand that their

24         commission payments were uncapped in the first half of 2015,

25         wouldn't it?

26     A. Yes.

27

28

17

CLASS ACTION COMPLAINT
Jury Trial Demanded

(Exhibit B, p. 79.)  Mr. Dorsey similarly testified that, if he were a salesperson and read the statements in the PowerPoint, he would think that his earnings were uncapped. (Exhibit D, p. 48.)

       c.  Ms. Maleki testified as follows about what exactly constitutes capping:

Q. What does that mean to you?

A. Capped?

Q. Right.

A. Is when your commissions get reviewed, and you know, you're supposed to get paid X amount, but you get paid Y.

Q. Something different than what your commission formula would produce?

A. Correct.

(Exhibit C, p. 25.) Mr. Dorsey straight-up testified that IBM's statements in the PowerPoints that it did not cap were not true, and that IBM often capped:

Q. Okay. Would you agree that under the commissions programs at IBM while you were there from the 2013 to 2015, that a software salesperson's earnings opportunity was uncapped?

A. No. I don't think any -- I don't think since I was there that their earnings were ever uncapped....

Q. And you see that each of these under the earnings opportunity block on the left side of the page, the third bullet point says, "Earnings opportunity remains uncapped"?

A. I do see that.

Q. And that's each of these four, on page 83, page 84, page 85, page 86, every single one of these says, "Earnings opportunity remains uncapped"; is that correct?

18

CLASS ACTION COMPLAINT
Jury Trial Demanded

A. That's what I'm seeing, yeah.

Q. But that's not true from what you remember at IBM?

A. That's correct. I don't believe that's true.

(Exhibit D, pp. 43, 46-47.)

90.     The Choplin Depositions also make clear that, despite IBM's claim that it did not "cap" Mr. Choplin's commission when it reduced his commission payments, IBM employees used that exact term several times in emails when discussing the reduction in Mr. Choplin's commission payments.

91.     Indeed, an email was produced in the Choplin case where Randolph Moorer specifically "recommend[ed] capping" the commissions of another sales representative, Mr. Stephenson, on both the LabCorp and BB&T Deals by approximately $600,000. (**Exhibit E**).

92.     IBM's Rule 30(b)(6) designee in the Choplin case testified that IBM is not "capping" commissions, only "adjusting" them. (Exhibit A, p. 45). He further testified that "as long as IBM's adjustments are to a specific deal and not all deals, IBM's position is that's not a cap." (Exhibit A, p. 107).

93.     Contrary to Mr. Martinotti's testimony on behalf of IBM, other IBM employees, including managers, executives, and sales representatives, are totally unaware of the distinction that IBM attempts to make between a "cap" and an "adjustment" and almost exclusively refer to what IBM does as "capping" or a "cap" on commissions. (Exhibit B, p. 43; Exhibit C, p. 27; and Exhibit E).  Indeed, as noted above, they use that exact word in their internal emails.

94.     IBM claims that this usage of the word "cap" is a "mistake." (Exhibit A, p. 119). On behalf of IBM, Mr. Martinotti testified that sales representatives, managers, and other executives within IBM commonly use the term "capped" but shouldn't be using that term; they should be using the term "adjusted" instead. Specifically, he testified:

19

CLASS ACTION COMPLAINT
Jury Trial Demanded

Q: Have you had anyone at IBM come to you after an adjustment and say, you know, "IBM capped me on this deal?"

A: And I would go back to them and say that they didn't cap you; they adjusted you.

Q. Okay. So, first, let me – that has happened?

A. Yes.

Q. Okay. So you would agree there is some confusion about the difference between a cap and an adjustment of commissions?

A. The answer is yes, there is confusion or, said differently, they use the term interchangeably incorrectly.

Q. Who is "they"?

A. The sales representatives.

Q. Okay, okay. You think – and managers too right?

A. Right. **Every adjustment they consider to be a cap**, and that's no – you know, a cap is not an adjustment and adjustment is not a cap.

(Exhibit A, p. 108) (emphasis added).

95. IBM also testified that executives such as Mr. Moorer (the executive actually responsible for determining whether and how much to cap Mr. Choplin's commissions on the BB&T Deal) are similarly mistaken when they use the term cap:

Q: So Mr. Moorer here is using the word "cap" and "capping" isn't he?

A: Correct. He is using the word "capping."

Q. Okay. He is making that mistake that you would correct him on, right?

A. Exactly.

CLASS ACTION COMPLAINT
Jury Trial Demanded

1     Q.  But Mr. Moorer is the one – is one of the people who exercises

2          judgment on those of how much or how little to pay in commissions,

3          right?

4     A.  Yes.

5 (Exhibit A, pp. 119-120).

6     96.    Despite IBM's contention that its sales representatives, managers, and

7 executives are all "confused" and "mistaken" when they refer to IBM's conduct as

8 "capping" commissions, IBM makes no efforts to clarify the confusion in its 200 pages

9 of Educational Materials. (Exhibit A, pp. 80-82). Indeed, none of the Educational

10 Materials (where IBM repeatedly promises commissions are uncapped) contain any

11 qualifiers or fine print of any kind.

12     97.    IBM does not clarify this confusion because it knows that if sales

13 representatives knew that IBM might cap their commissions, it would demotivate the

14 representatives and lead to lower sales for IBM. (Exhibit A, p. 158).

15     98.    IBM has even been told by its managers that it cannot continue to make

16 representations like that in light of IBM's actual practices. One manager, Tom

17 Batthany, wrote an email protesting IBM capping the commissions of a sales

18 representatives he managed, where he says: "We can no longer have folks stand in the

19 front of the room and say reps make $1 million and there are no caps." (**Exhibit F**).

20     99.    Another case pending in the Middle District of North Carolina that is very

21 similar to this one and that has yielded discovery is *William Stephenson v.*

22 *International Business Machines Corporation*, No. 17-cv-1141 ("the *Stephenson*

23 Action"). Upon information and belief, the plaintiff in the *Stephenson* Action had an

24 IPL that was in relevant part identical or substantially similar to Mr. Briggs's IPL,

25 and the *Stephenson* plaintiff was shown a PowerPoint presentation that was in

26 relevant part identical or substantially similar to the PowerPoint presentation shown

27 to Mr. Briggs. Furthermore, upon information and belief, many of the other facts and

28

CLASS ACTION COMPLAINT
Jury Trial Demanded

circumstances surrounding the commissions due to Mr. Stephenson, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Briggs, and what IBM actually paid him and why.

100.    In the *Stephenson* Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit G**); (2) a deposition of Mr. Stephenson's first-line (i.e., immediate) manager, Benjamin Blackwell (**Exhibit H**); (3) a deposition of Mr. Stephenson's second-line (i.e., two levels up) manager, Cleo Clarke (**Exhibit I**); and (4) a deposition of Randolph Moorer, a high-level IBM executive (**Exhibit J**).  Together, Exhibits G, H, I, and J are referred to as the "Stephenson Depositions."

101.    The witnesses in the Stephenson Depositions, including Mr. Martinotti on behalf of IBM, re-affirmed the truth of the key testimony and admissions in the Choplin Depositions, including those portions quoted above.

102.    Furthermore, Mr. Martinotti testified that much of his testimony in the Choplin case would "apply equally" in Stephenson's case because the relevant facts— the PowerPoints, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases.  The relevant facts in this case are same as those in both the *Choplin* Action and the *Stephenson* Action, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

103.    The Stephenson Depositions establish the following facts, among many others: (a) the PowerPoint had key information about commissions that was not in the IPL, it had more specific information than the IPL, its notes stated that it is the "primary" source for information about the commissions plan, and IBM itself has testified that the PowerPoint contains "the most detailed information" about a salesperson's commission plan; (b) the witnesses testified that IBM does not lie, and therefore that it is reasonable for salespeople to believe what IBM says—including its representation in the PowerPoint that "earnings opportunities" and "payments" were

22

"uncapped"; (c) in fact, IBM testified that salespeople can "take that to the bank" when IBM says that it does not cap and that it's "not foolish" for them to believe that, and that IBM has an "obligation" not to cap as a result; (d) internal IBM emails stated many times that IBM was "capping" Stephenson when it reduced his commissions as it did; (e) nowhere did IBM ever define "cap," although the witnesses testified that "capping" can occur when IBM reduces a commission on one specific deal; (f) IBM admitted that, at the very least, "reasonable minds could differ about how they use or understand the term 'cap' or 'capping'"; (g) IBM reduced Stephenson's commissions in order to satisfy a secret internal budget of commissions, based on a percentage of a deal's revenue—that is, the sole reason that Stephenson's commissions were reduced and the amount of the reduction were both based only on IBM's desire to reduce the amount of commissions payable to satisfy the budget; (h) IBM focused on the "high earners" and "high achievers" when deciding whom to cap, and not, for example, on those who worked less hard relative to their peers or whose commission was disproportionate to their work; (i) IBM did not purport to cap or actually cap Mr. Stephenson based on the Significant Transactions Provision of the IPL (j) one of the witnesses testified that what IBM did to Stephenson surprised her and did not "make sense" to her; (k) Martinotti, on behalf of IBM, testified that he did not see the emails about the reasons for Mr. Stephenson's commissions reduction until his deposition and that he did not "agree" with capping to stay on budget and that doing so would be "questionable"; and (l) Mr. Stephenson's commissions were actually "earned" under the terms of the IPL when he was capped.

104. The testimony in the prior paragraph applies equally to Mr. Briggs, and in any event Mr. Briggs alleges that: (a) he was reasonable to rely on IBM's promise that it would not cap him; (b) when IBM reduced his commission, it "capped" him, just like Mr. Stephenson was capped, and that internal emails and testimony from IBM will confirm as much; (c) IBM capped him to meet a budget or otherwise only to reduce

CLASS ACTION COMPLAINT
Jury Trial Demanded

1 the amount that it had to pay in commissions; and (d) IBM did not purport to rely on
2 or actually comply with the "Significant Transactions Provision" of the IPL.

3    105.    Another case that was filed in the Northern District of California, that is
4 very similar to this one and that has yielded discovery is the *Swafford* Action, also
5 referenced extensively above.  Mr. Swafford had an IPL that was in relevant part
6 identical or substantially similar to Mr. Briggs's IPL, and the plaintiff was shown a
7 PowerPoint presentation with representations that were in relevant part identical or
8 substantially similar to the representations made to Mr. Briggs. Furthermore, upon
9 information and belief, many of the other facts and circumstances surrounding the
10 commissions due to Mr. Swafford, and what IBM actually paid him and why, are
11 similar to the facts and circumstances surrounding the commissions due to Mr. Briggs,
12 and what IBM actually paid him and why.[2]

13    106.    In the *Swafford* Action, the plaintiff took four depositions: (1) a Rule
14 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit
15 K**); (2) a deposition of Mr. Swafford's first-line (i.e., immediate) manager, Mark Briggs
16 (**Exhibit L**); (3) a deposition of Mr. Swafford's second-line (i.e., two levels up) manager,
17 Richard Wirtenson (**Exhibit M**); and (4) a deposition of Donald Leeke, a high-level
18 IBM executive (**Exhibit N**). Together, Exhibits K, L, M, and N are referred to as the
19 "Swafford Depositions."

20    107.    The witnesses in the Swafford Depositions, including Mr. Martinotti on
21 behalf of IBM, re-affirmed the truth of the key testimony and admissions in the
22 Choplin Depositions and the Stephenson Depositions, including those portions quoted
23 above.

24

25 [2] As mentioned above, Mr. Swafford reported to Mr. Briggs, who was his manager, and
26 as an IBM manager, Mr. Briggs's commissions were based on the achievement and
27 commissions of the sales representatives that reported to him, including Mr. Swafford.
*See, e.g.*, ¶¶ 57, 68-84, *supra.*

28

CLASS ACTION COMPLAINT
Jury Trial Demanded

108.   Furthermore, Mr. Martinotti testified that much of his testimony in the *Choplin* Action and the *Stephenson* Action would "apply equally" in Mr. Swafford's case because the relevant facts—the PowerPoints, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases.  The relevant facts in this case are same as those in both the *Choplin* Action and the *Stephenson* Action, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

109.   The Swafford Depositions establish facts that are similar or identical to those established in the Choplin Depositions and Stephenson Depositions, as outlined above. Most importantly, they establish: (a) that Swafford was reasonable in relying on IBM's representation that it would not "cap" his commission; and (b) that IBM "capped" him when they reduced his commissions.

110.   The key testimony in the Swafford Depositions applies equally to Mr. Briggs, and in any event Mr. Briggs alleges that: (a) he was reasonable to rely on IBM's promise that it would not cap him; (b) when IBM reduced his commission, it "capped" him, just like Mr. Swafford was capped, and that internal emails and testimony from IBM will confirm as much; (c) IBM capped him to meet a budget or otherwise only to reduce the amount that it had to pay in commissions; and (d) IBM did not purport to rely on or actually comply with the "Specific Transactions Provision" of the IPL.

111.   And another case that was filed in the Northern District of California, that is very similar to this one and that has yielded discovery is *Jerome Beard v. International Business Machines Corporation*, No. 18-cv-06783 (the "*Beard* Action"). The plaintiff in the *Beard* Action also had an IPL that was in relevant part identical or substantially similar to Mr. Briggs's IPL, and the plaintiff was shown a PowerPoint presentation with representations that were in relevant part identical or substantially similar to the representations IBM made to Mr. Briggs. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Beard, and what IBM actually paid him and why, are similar

CLASS ACTION COMPLAINT
Jury Trial Demanded

to the facts and circumstances surrounding the commissions due to Mr. Briggs, and what IBM actually paid him and why.

112.    The witnesses in the depositions in the *Beard* Action (the "Beard Depositions") also re-affirmed the truth of the key testimony and admissions in the Choplin Depositions and the Stephenson Depositions, including those portions quoted above.

113.    Furthermore, IBM executive Inhi Cho Suh testified that much of the testimony in the *Choplin* Action and the *Stephenson* Action would "apply equally" in the *Beard* Action because the relevant facts—the PowerPoints, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases.  The relevant facts in this case are same as those in both the *Choplin* Action and the *Stephenson* Action, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

114.    The Beard Depositions established facts that are similar or identical to those established in the Choplin Depositions, Stephenson Depositions, and Swafford Depositions, as outlined above. Most importantly, they establish: (a) that Beard was reasonable in relying on IBM's representation that it would not "cap" his commission; and (b) that IBM "capped" him when they reduced his commissions.

115.    The key testimony in the Beard Depositions applies equally to Mr. Briggs and in any event Mr. Briggs alleges that: (a) he was reasonable to rely on IBM's promise that it would not cap him; (b) when IBM reduced his commission, it "capped" him, just like Mr. Beard was capped, and that internal emails and testimony from IBM will confirm as much; (c) IBM capped him to meet a budget or otherwise only to reduce the amount that it had to pay in commissions; and (d) IBM did not purport to rely on or actually comply with the "Specific Transactions Provision" of the IPL.

116.    In short, of all of the cases alleging facts similar to those alleged in this case, eight have yielded significant discovery, two of which proceeded in the Northern

CLASS ACTION COMPLAINT
Jury Trial Demanded

1   District of California. In all of these cases, the discovery has shown that the key facts

2   alleged were in fact true—and those facts apply equally in this case.

3       117.   Mr. Briggs has met all conditions precedent to the bringing of this action.

4       118.   The statutes of limitation applicable to Mr. Briggs's claims have been

5   tolled due to the pendency of another class action that Mr. Briggs is a putative member

6   of: *Mark Comin v. International Business Machines Corporation*, Case No. 19-cv-

7   07261-JD (N.D. Cal.).

8   **CLASS ACTION ALLEGATIONS**

9       119.   Plaintiff brings this action individually and as a class action pursuant to

10   Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) seeking injunctive and monetary relief for

11   IBM's systematic refusal to provide its sales representatives with contracts for the

12   payment of their sales commissions and improper withholding of sales commissions.

13       **A.  Class Definition**

14       120.   Plaintiff brings this action on behalf of the following class and subclass:

15       Class:

16       All persons residing or who resided in the State of

17       California while working for IBM on a commissions

18       incentive plan during the Relevant Time Period.

19       Subclass:

20       All persons residing or who resided in the State of

21       California while working for IBM on a commissions

22       incentive plan during the Relevant Time Period and that

23       were not paid the amount of commissions reflected in the

24       individual's commissions formula.

25       121.   The Relevant Time Period is November 4, 2015 through the present.

26

27

CLASS ACTION COMPLAINT
Jury Trial Demanded

122. Plaintiff reserves the right to amend the Class and SubClass definitions if discovery and further investigation reveal that the Classes should be expanded, divided into subclasses under Rule 23(c)(5), or modified in any other way.

123. Plaintiff is a member of the Classes he seeks to represent.

124. The sales commission practices described herein have been and are continuing in nature.

**B. Rule 23(a) and Rule 23(b)(3) Requirements**

**a. Numerosity**

125. The proposed Classes are so numerous that joinder of all members is impracticable.

126. Upon information and belief, there are hundreds, perhaps thousands, of members of the proposed Classes.

127. The Class and SubClass members are ascertainable through IBM's centralized and electronically maintained records.

**b. Commonality**

128. The prosecution of Plaintiff's claims will require the adjudication of numerous questions of law and fact common to the Class and the SubClass. The common questions of law and fact predominate over any questions affecting only individual Class and SubClass members. The common questions include:

  a. Whether the terms of Defendant's standardized IPLs comply with California law governing earned commission wages;

  b. Whether Defendant's standardized IPLs comply with Cal. Labor Code § 2751;

  c. Whether IBM paid less to the Class and SubClass members than the formulas in the IPLs provided for;

CLASS ACTION COMPLAINT
Jury Trial Demanded

d.  Whether IBM should be ordered to disgorge all or part of the ill-gotten profits it received by not paying its sales representatives in accordance with their commissions formulas;

e.  Whether the Class and SubClass are entitled to damages and the amount of damages;

f.  The amount of formulaic damages due to each member of the Classes;

g.  Whether IBM should be enjoined from continuing to be out of compliance with Cal. Labor Code § 2751; and

h.  In other ways as shown in discovery.

**c.   Typicality**

129.   Plaintiff has suffered the same violations and similar injuries as other Class and SubClass members arising out of and caused by IBM's common course of conduct. All Class and SubClass members were subject to the same corporate practices as alleged herein, in particular, by being provided standardized commissions plans that were purportedly not a contract and ultimately being subjected to reduced commissions payments.

130.   Plaintiff possesses and asserts each of the claims he asserts on behalf of the proposed Classes.

131.   Plaintiff seeks similar relief as other Class and SubClass members.

**d.   Adequacy of Representation**

132.   Plaintiff is an adequate representative of the Class and SubClass.

133.   Plaintiff's interests are coextensive with those of the members of the proposed Classes. Plaintiff is willing and able to represent the proposed Classes fairly and vigorously as he pursues his similar individual claims in this action.

134.   Plaintiff will fairly and adequately protect the interests of the Classes because they have no interests antagonistic to, or in conflict with, the Classes that Plaintiff seeks to represent.

CLASS ACTION COMPLAINT
Jury Trial Demanded

135.   Plaintiff has retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate a class action of this size and complexity.

**e.**   **Predominance & Superiority**

136.   A class action is superior to other available means for the fair and efficient adjudication of this controversy.

137.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly where individual class members lack the financial resources to vigorously prosecute a lawsuit against a large corporation such as IBM.

138.   Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

139.   Current IBM employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are often fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

140.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Classes, establishing incompatible standards of conduct for IBM and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.

CLASS ACTION COMPLAINT
Jury Trial Demanded

141.   The issues in this class action can be decided by means of common, class-wide proof. In addition, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

142.   IBM has acted on grounds generally applicable to Plaintiff and the proposed Class and SubClass by adopting and following systematic policies, practices, and procedures that deprive sales employees of earned commission wages. Refusal to pay all commission wages is IBM's standard operating procedure, rather than a sporadic occurrence.

143.   IBM has acted or refused to act on grounds generally applicable to Plaintiff and the proposed Class and SubClass. IBM's systematic conduct justifies the requested injunctive and declaratory relief with respect to the Classes as a whole.

### f.   Injunctive/Declaratory Relief

144.   Injunctive, declaratory, and affirmative relief are a predominate form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of IBM's refusal to comply with California Labor Code § 2751 and to pay all commission wages due. In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for the monetary and non-monetary remedies for individual losses caused by IBM's systemic refusal to pay full commissions.

### C.   Requirements of Rule 23(c)(4) Issue Certification

145.   Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class and SubClass members.

CLASS ACTION COMPLAINT
Jury Trial Demanded

**FIRST CLAIM FOR RELIEF**
**(Violation of the California Unfair Competition Law)**

146.   Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

147.   IBM is a "person" as defined under California Business & Professions Code Section 17021.

148.   California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." IBM has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

149.   IBM's conduct, as described herein, was and is in violation of the UCL.

150.   IBM's conduct violates the UCL in at least the following ways:

      a.  by establishing and operating an unfair commissions scheme;

      b.  by knowingly refusing to provide a written commissions contract to Mr. Briggs and the Classes;

      c.  by willfully failing to pay all earned commissions wages to Mr. Briggs and the Classes; and

      d.  by violating other California laws, including but not limited to, California Labor Code Section 2751.

151.   Furthermore, any failure to pay wages is, by definition, an unfair business practice under Section 17200.

152.   IBM's actions alleged herein caused Plaintiff and the Classes to sell as many of IBM's products and services as they could, often at the expense of quality time with their families that they would not otherwise have sacrificed had they known that IBM would not pay them the commissions they earned.

153.   IBM's actions are unfair because they prop up IBM sales employees with promises of unlimited earnings opportunities when in reality IBM never intends to stand by that policy and regularly (secretly) reduces commissions payments.

CLASS ACTION COMPLAINT
Jury Trial Demanded

154.   Accordingly, Plaintiff and the Classes have suffered injury in fact including, including, lost money, as a result of IBM's failure to have enforceable written contracts—which presumably IBM would have complied with, but which could be the basis for an easy breach of contract claim if it did not.  Put another way, the obvious purpose of California Labor Code Section 2751's requirement of a written contract is to legally obligate employers to specify how commissions will be paid and pay them.  If an employer violates California Labor Code Section 2751 by not having such a contract, then its employees are harmed because the employer is not obligated to specify and pay commissions under such a contract.  Here, if IBM had complied with California Labor Code Section 2751, it would have had enforceable contracts with Plaintiff and the Classes; IBM would have complied with those contracts, or its employees could easily sue if IBM did not, and either way the employees would be in a better situation than they are now.

155.   IBM should be made to disgorge these ill-gotten gains and to restore to Mr. Briggs and the Classes the wrongfully withheld wages to which they are entitled, as well as interest on these wages.

156.   As alleged above, Labor Code Section 2751 states, in pertinent part: "Whenever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and set forth the method by which the commissions shall be paid."  The statute also provides that an employer must give a "signed" copy of the contract to the employee and obtain a receipt for the contract from the employee.

157.   As alleged above, IBM violated section 2751 because the IPL undisputedly is not a contract, and therefore it is not sufficient under section 2751, and there is no other document that is a written contract sufficient under section 2751. Furthermore, IBM violated section 2751 because IBM did not sign any sufficient

CLASS ACTION COMPLAINT
Jury Trial Demanded

contract (and it did not sign the IPL), nor did IBM obtain a receipt from Plaintiff or members of the Classes for their receipt of any written contract.

158.    A violation of section 2751 serves as a predicate violation for a claim under the UCL.

159.    Plaintiff alleges a claim against IBM for violation of the UCL for its unlawful conduct in violating the provision of section 2751, as outlined above.

160.    Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendant under Cal. Bus. & Prof. Code § 17200 *et seq.*

161.    Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin IBM from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the members of the Classesany money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below, including, but not limited to Plaintiff's attorneys' fees.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

162.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

163.    At the specific request of IBM and for its use and benefit, Plaintiff and the Subclass performed work for IBM in the form of making sales of its software and services.

164.    IBM received substantial benefits from the sales obtained by Plaintiff and other members of the Subclass, including benefits from the receipt and unjust retention of sales commissions notwithstanding IBM's representations and obligations not to do so.

CLASS ACTION COMPLAINT
Jury Trial Demanded

165.   The full value of the work performed for IBM by Plaintiff and the Subclass for which they have not been paid is tens of millions of dollars, although the exact amount is for the jury.

166.   During and since the performance of the work by Plaintiff and the Subclass, IBM has failed to pay them and there is due and owing to Plaintiff and the Subclass from IBM a principal sum amount of tens of millions of dollars.

167.   It is unjust to allow IBM to retain the benefits received because of IBM's wrongful conduct and at the expense of Plaintiff and other members of the Subclass.

168.   IBM's retention of those benefits came at the expense of Plaintiff and other members of the Subclass.

169.   IBM's continued retention of some or all of the monies it gained through its wrongful acts and practices described herein was and is unjust considering the circumstances of IBM obtaining those monies.

170.   Plaintiff and the other members of the Subclass are entitled to a judgment against IBM ordering the restitution and/or disgorgement of all monies, benefits, and other compensation obtained and retained by the IBM by which it has been unjustly enriched because of its wrongful conduct, in an amount of *at least* $75,000 with the exact amount to be determined at trial.[3]

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Briggs and the Classes pray the Court for the following relief:

1.   That the Court certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

---

[3] Plaintiff is sending notice letters today to the California Labor & Workforce Development Agency and IBM regarding his intent to seek civil penalties pursuant to the Private Attorneys General Act of 2004 (California Labor Code § 2699 *et seq.*) for IBM's violations of Labor Code Section 2751. Plaintiff expects to file an amended pleading that includes such a claim in this lawsuit if appropriate after that pre-suit notice process is complete.

CLASS ACTION COMPLAINT
Jury Trial Demanded

2.    That the Court name Plaintiff as Class Representative and his counsel as Class Counsel;

3.    That Mr. Briggs and the Classes have and recover restitution from IBM from its violations of the California Unfair Competition Law under Business and Professions Code Section 17200 *et. seq.*;

4.    That the Court enter an order enjoining IBM from continuing to violate California Labor Code Section 2751 pursuant to Business and Professions Code Section 17200 *et. seq.*;

5.    That the Court grant restitution to Plaintiff and the Classes and require IBM to disgorge ill-gotten gains and monies by which it was unjustly enriched;

6.    That the Court award attorneys' fees to Plaintiff pursuant Cal. Civ. Proc. Code § 1021.5 and any other applicable law;

7.    That the Court award Plaintiff and the Classes pre-judgment and post-judgment interest at the highest legal rate provided by law;

8.    That all costs of this action be taxed against IBM; and

9.    That the Court award Mr. Briggs and the Class such other and further relief as this Court may deem just and proper.

10.    PLAINTIFF DEMANDS A TRIAL BY JURY.

This the 27th day of August 2021.

BY:    */s/ Alex R. Straus*
Alex R. Straus (SBN: 321366)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN**
280 Beverly Hills Drive, Penthouse
Beverly Hills, CA 90212
Telephone:   310-450-9689
Facsimile:    310-496-3176
astraus@milberg.com

CLASS ACTION COMPLAINT
Jury Trial Demanded

Matthew E. Lee*
Mark R. Sigmon*
Jeremy R. Williams*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
mlee@milberg.com
msigmon@milberg.com
jwilliams@milberg.com

*Counsel for Plaintiff*

 * application for admission *pro hac vice*
forthcoming

37

CLASS ACTION COMPLAINT
Jury Trial Demanded